IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY, and
SIERRA CLUB,

      Plaintiffs,

v.                             Case No.:  3:12-cv-00785

ELK RUN COAL COMPANY, INC.,
and ALEX ENERGY, INC.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

The Court has been asked to consider three motions filed by Defendants, all of which involve the confidentiality of benthic macroinvertebrate surveys performed by or at the request of Defendants for their internal use. (ECF Nos. 31, 33, 34). Plaintiffs responded to the motions, and Defendants replied. (ECF Nos. 39, 40). On March 26, 2013, the undersigned heard argument from the parties and took the matter under advisement. Having now fully considered the positions of the parties, the Court **DENIES** Defendants' Motion for Protective Order (ECF No. 33) and further **DENIES** Defendants' Motions to Seal (ECF Nos. 31, 34).

### I.    Relevant History

On March 30, 2012, Plaintiffs filed a citizens' complaint for declaratory judgment and injunctive relief, alleging that Defendants' coal mining operations in Boone and Nicholas Counties had contaminated streams in the Laurel Creek and

Twentymile Creek watersheds in violation of the Clean Water Act ("CWA") and the Surface Mining Control and Reclamation Act ("SMCRA"). Plaintiffs did not specifically complain about the levels of selenium found in the water, but argued that Defendants' activities had resulted in excessive levels of conductivity and sulfate, had biologically impaired aquatic life, and had resulted in chronic toxicity of the streams and tributaries in the watersheds.

In July 2012, Plaintiffs filed Requests for Production of Documents on Defendant Alex Energy, Inc. ("Alex Energy") in which Plaintiffs asked for "[d]ocuments related to monitoring, sampling, analysis, or whole effluent toxicity testing of the water in Twentymile Creek upstream or downstream from the mouth of Robinson Fork, including, but not limited to, data on flow, conductivity, sulfate, selenium, iron, magnesium or pH." In September, Alex Energy responded to the request, objecting on the ground that Plaintiffs had failed to limit their inquiry to the specific pollutants at issue in the lawsuit. Nevertheless, without waiving the objection, Alex Energy produced the benthic macroinvertebrate[1] surveys now at issue, which contained water chemistries documenting levels of various contaminants, including selenium. Alex Energy neither marked the surveys "confidential," nor placed any limitations on their use. In addition, no protective order was in place.

In December 2012, Plaintiffs sent Alex Energy a 60-day notice of intent to file suit under the CWA and SMCRA on the basis that recent stream monitoring showed elevated levels of selenium in Hardway Branch, a tributary of Twentymile Creek

---

[1] "Benthic macroinvertebrates are small animals living among the sediments and stones on the bottom of streams, rivers, and lakes." West Virginia Department of Environmental Protection, *Benthic Macroinvertebrate and Fish Information,* found at www.dep.wv.gov. Because benthic macroinvertebrate communities respond to environmental stressors, they are an excellent indicator of water conditions. Collection and testing of benthic macroinvertebrate samples assist in assessing water quality and in identifying causes of water quality impairment. *Id.*

downstream from its confluence with Robinson Fork. In the notice of intent, Plaintiffs specifically relied upon selenium levels found in the benthic macroinvertebrate surveys supplied by Alex Energy in this case. Upon receipt of the notice, Alex Energy realized that it had inadvertently provided Plaintiffs with water chemistries reflecting measurements of selenium. Consequently, Alex Energy requested that Plaintiffs return the selenium materials, but Plaintiffs refused, reiterating their intent to rely on the surveys in support of the proposed new lawsuit.

Unable to resolve the dispute, Alex Energy filed a Motion for Protective Order. Alex Energy no longer seeks return of the surveys, conceding that Plaintiffs may use them to prosecute the instant action, but asks the Court to prohibit dissemination and use of the surveys outside of this litigation. In addition, Alex Energy filed Motions to Seal copies of the benthic macroinvertebrate surveys, which were submitted to the Court for purposes of resolving the motion for protective order.

## II. Contentions of the Parties

Alex Energy claims that selenium data is not relevant to the instant action and should have been redacted from the benthic surveys before they were produced to Plaintiffs. Alex Energy claims that it took reasonable steps to remove all references to selenium from thousands of pages it produced in discovery; unfortunately, the individuals responsible for redaction overlooked the water chemistries found in the surveys; thus, the selenium levels were accidentally released. Alex Energy concedes that the benthic surveys are not privileged as attorney/client communications nor protected as work product; however, it contends that the surveys constitute confidential commercial research subject to protection under Federal Rule of Civil Procedure 26(c)(1)(G). According to Alex Energy, the benthic surveys were performed

over a period of twelve years to investigate and trend the biological condition of the streams closest to its operations. The surveys have independent commercial value because they provide irreplaceable historical data useful for selecting mine sites and supporting permit applications. Alex Energy also emphasizes that it closely guarded the studies and never intended to publicly disclose them. In Alex Energy's view, if the studies are released to the public, Alex Energy will be harmed in two ways. First, Plaintiffs will use the studies as a foundation for litigation and, second, competing mining operations will be able to use the data without having incurred the time and expense necessary to create it. Alex Energy argues that limiting the use and disclosure of the surveys is appropriate, because the "general trend in the law is to protect parties who have inadvertently disclosed confidential information." (ECF No. 33 at 2).

In response, Plaintiffs disagree that selenium data is irrelevant to the instant action. Plaintiffs contend that their complaint alleges pollution of public waters by Alex Energy. Although they specifically mention sulfates and conductivity in the complaint, they are entitled to gather information relevant to the overall quality of the water in the Twentymile Creek watershed. Plaintiffs point out that they requested data about selenium and other pollutants in discovery, and Alex Energy produced the benthic surveys in response. Alex Energy made no effort to designate the surveys as confidential or obtain a protective order prior to their production, and the surveys display no indicia of confidentiality. Moreover, Plaintiffs argue that the benthic surveys do not constitute confidential commercial research. According to Plaintiffs, water quality monitoring data is commonly collected and publicly disclosed as part of the West Virginia National Pollutant Discharge Elimination System ("NPDES")

permitting program. Plaintiffs add that Rule 26(c) creates a "presumption in favor of freedom of dissemination;" therefore, Alex Energy must demonstrate a *genuine* need to be protected against a *genuine* harm. Plaintiffs further argue that their intended use of the benthic surveys to enforce Alex Energy's compliance with environmental laws is proper and, thus, is not a harm or abuse from which Alex Energy should be protected. (ECF No. 39).

### III. Motion for Protective Order

#### Federal Rule of Civil Procedure 26(c)(1)(G)

Federal Rule of Civil Procedure 26(c)(1)(G) allows the court, for good cause, to issue an order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." In order for the court to apply the rule, two criteria must exist. First, the material sought to be protected must be "a trade secret or other confidential research, development, or commercial information." Second, there must be a "good cause" basis for granting the restriction. The party seeking protection bears the burden of establishing both the confidentiality of the material and the harm associated with its disclosure. *Deford v. Schmid Prods. Co.,* 120 F.R.D. 648, 653 (D.Md. 1987) (citing *Cipollone v. Liggett Group, Inc.,* 785 F.2d. 1108, 1121 (3rd Cir. 1986)). However, once these elements are demonstrated, the burden shifts to the party seeking disclosure to show that the material is relevant and necessary to its case. *Empire of Carolina, Inc. v. Mackle,* 108 F.R.D. 323, 326 (D.C. Fla. 1985). The court "must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled." *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 787 (3rd Cir. 1994) (quoting Arthur R. Miller,

*Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv.L.Rev. 427, 432–33 (1991).

If the court determines that disclosure is required, the issue becomes whether the materials should be "revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G) "Whether this disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of disclosure to the public." *Id.* Factors to consider when deciding if and how to limit disclosure include:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefiting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Pansy,* 23 F.3d at 787-91. Although the court exercises broad discretion in deciding "when a protective order is appropriate and what degree of protection is required, *Furlow v. United States,* 55 F.Supp.2d 360, 366 (D.Md.1999) (quoting *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)), protective orders "should be sparingly used and cautiously granted." *Baron Fin. Corp. v. Natanzon,* 240 F.R.D. 200, 202 (D.Md.2006) (quoting *Medlin v. Andrew,* 113 F.R.D. 650, 653 (M.D.N.C.1987)).

Defendants have already agreed that the surveys may be disclosed and used by Plaintiffs for purposes of prosecuting their claims in this case.[2] Consequently, the

---

[2] In light of Defendants' concession, the parties' arguments about the relevancy of the surveys to the present litigation are moot.

- 6 -

only remaining issue is whether disclosure of the materials should be limited to the instant action; an issue which requires the court to weigh the potential harm to Defendants from unfettered disclosure of the surveys against the importance of their availability to the public. *Pansy,* 23 F.3d at 787. To perform this analysis, the court must backtrack to the initial questions: (1) are the surveys confidential commercial information and (2) have Defendants shown good cause for a protective order. For the reasons that follow, the undersigned concludes that the benthic macroinvertebrate surveys are not confidential commercial research as envisioned by Rule 26(c), and Defendants have not shown good cause for limiting their disclosure.

### Confidential Commercial Information

The question of whether a corporation's research constitutes "confidential commercial information" under Rule 26(c) depends upon the nature, purpose, and use of the research. To merit protection under Rule 26(c), commercial information must be more than just routine business data; instead, it must be important proprietary information that provides the business entity with a financial or competitive advantage when it is kept secret and results in financial or competitive harm when it is released to the public. *Gonzales v. Google, Inc.,* 234 F.R.D. 674, 684 (N.D.Cal. 2006); *see also Diamond State Ins. Co. v. Rebel Oil Co., Inc.,* 157 F.R.D. 691, 697 (D.Nev. 1994) ("Confidential commercial information" is "information, which disclosed, would cause substantial economic harm to the competitive position of the entity from whom the information was obtained."). To better illustrate the type of information entitled to protection under Rule 26(c), courts have likened the characteristics of "confidential commercial information" to those of "trade secrets." *See Massey Coal Services, Inc. v. Victaulic Company of America,* 249 F.R.D. 477,

482 (S.D.W.Va. 2008) (citing West Virginia Code § 47-22-1(d), "trade secret includes a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value form its disclosure or use."). When evaluating whether information rises to the level of a trade secret, courts have considered the following factors found in Section 757 of the Restatement of Torts:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount or effort or money expended ... in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*United States v. International Bus. Mach. Corp.,* 67 F.R.D. 40, 46-47 (S.D.N.Y. 1975). Thus, consideration of these factors is useful in discerning whether corporate research qualifies as confidential commercial information entitled to protection under Rule 26(c).

In this case, the benthic macroinvertebrate surveys are not confidential commercial information because the type of data contained in the surveys is frequently collected and reported by mining and manufacturing operations that discharge pollutants into public waters. Moreover, the results of water quality testing, including benthic macroinvertebrate sampling and water chemistries, are regularly disclosed by government agencies to the general public and are included in annual reports on the health of watersheds throughout the United States. Alex Energy does not claim to have developed a unique formula, pattern, protocol or device and cannot

articulate a concrete commercial value that attaches to the surveys. The introduction sections to several of the surveys suggest that the stream monitoring was *not* conducted by Alex Energy to gain a competitive business edge or even for strategic purposes; rather, it was performed secondary to NPDES permits and for required regulatory compliance. (ECF No. 37-14 at 11) (survey was "presented to satisfy the requirements of the United States Environmental Protection Agency for the submitting of biological data for documenting the status of streams proposed for disturbance ... [and] to assist in establishing NPDES discharge limitations"); (ECF No. 31-4 at 12) (survey was part of a "mitigation process" for the disturbance and relocation of several hundred feet of stream channel); (ECF No. 38-1 at 3) (survey was a continuation of required monitoring for the United States Army Corps of Engineers). Although Alex Energy argues that it has maintained the confidentiality of the surveys, it admits that much of the data contained in the survey reports is the type of data that it would disclose to government agencies when requested or when required by the permitting process. Thus, notwithstanding the apparent safeguarding of the surveys, Alex Energy simply has not demonstrated that keeping the surveys private provides it with an independent commercial advantage that morphs into a substantial competitive harm if the surveys are disclosed. Alex Energy does not present evidence or argument on the cost of conducting the research, or the extent to which the research is used within the corporation; regardless, water chemistries and benthic macroinvertebrate surveys can be performed by other mining companies, government agencies, and environmental groups with relative ease. The testing and measurement protocols used by Alex Energy are not unique to its surveys; rather they are the standard and generally accepted protocols developed by the West Virginia and

United States Environmental Protection Agencies and the West Virginia Department of Natural Resources. Nothing about the data reported or its method of collection was innovative or exclusive to Alex Energy. Moreover, the benthic macroinvertebrate surveys do not reveal any information specific to the operations at Alex Energy, or its financial situation, strategic planning, market share, or customer lists. Indeed, Alex Energy produced the surveys in discovery, with full knowledge that the surveys had not previously been disclosed outside of the company or in their entirety. Yet, Alex Energy made no any effort at that time to restrict their use or disclosure, which suggests that Alex Energy did not consider the surveys, on their face, to constitute highly sensitive commercial information.[3]

Admittedly, Alex Energy went to the trouble of collecting and analyzing the stream samples and may be the only entity that currently possesses twelve years of testing results in their entirety and in their current format. However, Alex Energy has not established that the survey results are known only to Alex Energy and that the surveys have independent commercial value. Environmental studies done for the purpose of regulatory monitoring do not fall neatly within any category of information recognized as constituting confidential commercial research. The undersigned likewise has found no case law supporting such a conclusion. *See, e.g. Nutratech, Inc., v. Syntech Intern, Inc.,* 242 F.R.D. 552, 555 (N.D. Cal. 2007) (customer lists and revenue information are confidential); *Culinary Foods, Inc. v. Raychem Corp.,* 151 F.R.D. 297 (D.Ill. 1994) (product design and development and marketing strategy are confidential); *Miles v. Boeing,* 154 F.R.D. 112, 114 (E.D.Pa.

---

[3] Alex Energy indicated at oral argument that its primary concern was limiting the use of the selenium measurements found in the surveys. However, if the type of data contained in the surveys is not confidential, it would be illogical for the Court to find that only the selenium measurements are proprietary and entitled to protection.

1994) (documents showing labor costs are confidential); *Vollert v. Summa Corp.,* 389 F.Supp 1348 (D.Hawaii 1975) (financial information is confidential); *but* s*ee Massey Coal Services, Inc.,* 249 F.R.D. at 482-83 (chronology prepared during investigation of warranty claim not confidential research); *Mitchell v. Home Depot, U.S.A.,* 2012 WL 2192279 (W.D.Ky. June 14, 2012) (standard operating procedures and employee training materials are not confidential); *Minter v. Wells Fargo Bank, N.A.,* 258 F.R.D. 118, 122-23 (D.Md. 2009) (Managerial structures and general information regarding business operations are not the "sophisticated, innovative methods or inventions that are the result of human creativity and ingenuity" that define confidential commercial information); *Waelde v. Merck, Sharp & Dohme,* 94 F.R.D. 27, 29-30 (E.D.Mich. 1981) (new drug application file is not, in its entirety, confidential commercial information entitled to protection); *Parsons v. General Motors Corporation,* 85 F.R.D. 724, 725-26 (N.D.Ga. 1980) (rear impact crash tests and information regarding placement of automobile fuel tanks are not confidential commercial research). Therefore, the undersigned finds that the benthic macroinvertebrate surveys do not constitute confidential commercial research information under Rule 26(c).

### Good Cause

To establish good cause for a protective order, the moving party must show that disclosure of its commercial information will give rise to an "identifiable harm." *Minter v. Wells Fargo Bank, N.A.,* 2010 WL 5418910, at *8 (quoting *Deford,* 120 F.R.D. at 652–53); *see also In re Terrorist Attacks on Sept. 11, 2001,* 454 F.Supp.2d 220, 222 (S.D.N.Y.2006) (Good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury.") (quoting *Shingara v. Skiles,*

420 F.3d 301, 306 (3d Cir.2005)). The party "may not rely upon 'stereotyped and conclusory statements,' but "must present a 'particular and specific demonstration of fact' as to why a protective order should issue." *Baron Fin. Corp.,* 240 F.R.D. at 202 (quoting 8A Charles Alan Wright et al., *Fed. Prac. & Proc. Civ.* § 2035 (2d ed.1994)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *Id.* (quoting *Merit Industries, Inc. v. Feuer,* 201 F.R.D. 382, 384-385 (E.D.Pa.2001)).

"Where the party seeking protection under Rule 26 is a business, 'it must show that disclosure would cause significant harm to its competitive and financial position.'" *Waterkeeper Alliance v. Alan & Kristin Hudson Farm,* 278 F.R.D. 136, 140 (D.Md. 2011) (quoting *Minogue v. Modell,* 2011 WL 1308553, at *4 (D.Md. Mar. 30, 2011)). This showing must be made through "specific demonstrations of fact, supported where possible by affidavits and concrete examples rather than broad, conclusory allegations of potential harm." *Deford,* 120 F.R.D. at 653; *see also Andrew Corp. v. Rossi,* 180 F.R.D. 338, 341 (N.D. Ill. 1998) (Sufficient specificity standard requires a likely and significant injury); *Waelde,* 94 F.R.D. at 28 (E.D.Mich. 1981) (Harm must be clearly defined, rather than speculative competitive damage). A factually unsupported contention that research could potentially be used by a competitor, and the competitor would benefit by not having to incur the expense of conducting the research, is insufficient to establish actual and severe financial and competitive harm. *Waterkeeper Alliance,* 278 F.R.D. at 143.

Assuming Alex Energy could establish that benthic macroinvertebrate surveys and water chemistries were confidential commercial information, its request for a protective order still must fail for lack of good cause. As stated *supra*, a corporation

- 12 -

demonstrates good cause under Rule 26(c) by showing an identifiable harm to its competitive and financial position, which is supported by concrete examples and articulated reasoning. Here, Alex Energy alleges two harms. First, it claims that it will suffer a competitive disadvantage if others are permitted access to the benthic macroinvertebrate surveys inasmuch as competitors could obtain valuable information without incurring any costs. To support this claim, Alex Energy supplies an affidavit prepared by David Willson, its Environmental Compliance Manager. (ECF No. 40-1). In the affidavit, Mr. Willson testifies that "[h]aving an understanding of a watershed in a region in which the company is operating gives the company a competitive advantage ... [w]atershed data gives companies an advantage in permitting operations and in compliance." *Id.* at 1. Nonetheless, Mr. Willson does not explain the nature of the "competitive advantage" resulting from the surveys and, more importantly, provides no support for a claim that Alex Energy would suffer *serious* harm to its competitive and financial position if the data was released. *See Cipollone v. Liggett Group, Inc.,* 113 F.R.D. 86, 89-90 (Moving party must show how preventing release of discovery materials is needed to prevent particularized significant injury to position.). Alex Energy makes no claim that any specific mining business is currently interested in obtaining a permit in the same watershed, and, if so, that it could use Alex Energy's studies to support a permit application. To the contrary, the parties agree that water quality surveys submitted with applications for NPDES permits must be recent. The benthic surveys in this case were performed between 2000 and 2012, with the most recent water collection occurring almost a year ago. "While staleness of the information sought to be protected is not an absolute bar to issuance of an order, it is a factor which must be overcome by a

specific showing of present harm." *Deford,* 120 F.R.D. at 654. Alex Energy provides no particular evidence of a present harm.

Next, Alex Energy argues that it will be harmed if Plaintiffs are permitted to use the surveys to support a second CWA lawsuit. According to Alex Energy, without the surveys, Plaintiffs cannot prove that violations of the CWA occurred prior to the filing of the proposed action, which is a requisite element of the claim. Alex Energy does not submit any law supporting the proposition that discovery materials may be protected under Rule 26(c) based solely on the likelihood that they will be used in other litigation. However, Alex Energy does provide case law holding that protective orders may be granted on the basis of undue burden or oppression when discovery is served in a lawsuit for the primary purpose of obtaining evidence to assist in other litigation. In response, Plaintiffs rely heavily upon the case of *Humboldt Baykeeper v. Union Pacific Railroad Company,* 244 F.R.D. 560 (N.D.Cal. 2007), in which the defendant sought a protective order prohibiting information from being disclosed outside of the pending litigation on the basis that the information was likely to be used in a contemporaneous administrative proceeding.

In *Humboldt Baykeeper*, plaintiffs sued the defendant, the developer of a parcel of admittedly contaminated property, for alleged violations of various statutes designed to protect against environmental contamination. In the discovery process, plaintiffs requested access to defendant's property in order to conduct testing to assess the extent and character of the contamination. Defendant sought a protective order to restrict the use of the test results, claiming that plaintiffs intended to use the results in an administrative proceeding arising from the same contamination. Defendant argued that it was "improper" for plaintiffs "to use the discovery tools that

are provided for use in civil litigation to acquire information for presentation in an administrative proceeding that includes no provisions for 'discovery.'" *Id.* at 564. The Court examined the relevant law, reviewing the kinds of "negatives" that could potentially justify the issuance of a protective order: "(1) abuses or misuses that are internal to the litigation process or that threaten the fair adjudication of the case; (2) improperly motivated harm to interests that are external to the litigation, or; (3) unintended but harmful collateral consequences to legitimate interests that are external to the litigation." *Id.* Applying the law to the facts before it, the Court concluded that defendant did not meet its burden to show abuse, misuse, or improper motivation by plaintiffs. Notwithstanding its ruling, the Court went on to emphasize that even if defendant had shown a right of privacy to the test results and a risk of substantial harm from their disclosure, the analysis would not end there. Before making a final decision on the motion, the Court would be required "to weigh fairly the competing needs and interests of parties affected by [the] discovery." *Id.* at 566 (quoting *Seattle Times v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

The undersigned finds the analysis followed by the Court in *Humboldt Baykeeper* to be persuasive. Alex Energy's allegation that Plaintiffs sought selenium information in this litigation primarily to support the filing of a second case is unconvincing. Plaintiffs requested information broadly relevant to the overall quality of the streams and tributaries in the Twentymile Creek watershed, not just materials related to selenium levels. Nothing in the record suggests that Plaintiffs knew in advance that Alex Energy held undisclosed selenium data, nor that Plaintiffs exploited the instant litigation for the purpose of promoting other litigation. Absent

evidence of abuse, bad faith, or improper motive in the discovery process, the potential use of the fruits of discovery in other litigation is not, alone, a basis for a protective order. *Cipollne,* 113 F.R.D. at 91 ("the Federal Rules do not foreclose the collaborative use of discovery" as long as "the initial litigation has not itself been instituted in bad faith for the purpose of obtaining documents for other actions"); *see also U.S. v. Hooker Chemicals & Plastics Corp,* 90 F.R.D. 421, 426 (D.C.N.Y., 1981) ("Use of the discovery fruits disclosed in one lawsuit in connection with other litigation, and even in collaboration among plaintiffs' attorneys, comes squarely within the purposes of the Federal Rules of Civil Procedure.").

Moreover, when weighing the competing needs and interests in this case using the factors outlined in *Pansy,* 23 F.3d at 787-91, the undersigned concludes that restricting the use of the surveys to the instant litigation is neither fair nor proper. Disclosure of the surveys will not violate any privacy rights, as the testing was performed on public waters. Plaintiff sought test results and surveys well before the threat of a second suit was lodged. Alex Energy makes no claim of embarrassment related to a release of the surveys and has not shown the risk of a specific and present harm to its competitive and financial condition associated with disclosure. The information contained in the surveys is undoubtedly important to public health and safety, and the case involves issues important to the public. Given the congressional goals associated with the Clean Water Act, which include eliminating the discharge of pollutants in the nation's waters and encouraging public participation in CWA proceedings, sharing the surveys will promote fairness and efficiency in the judicial system. *See* 33 U.S.C. § 1251.

Therefore, the undersigned finds that Alex Energy fails to establish good cause

for the entry of a protective order restricting the use and disclosure of the benthic macroinvertebrate studies.

## IV. <u>Motion to Seal</u>

Publicity of judicial records[4] "is necessary in the long run so that the public can judge the product of the courts in a given case." *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.,* 203 F.3d 291, 303 (4th Cir. 2000). The right of public access to materials filed with the court derives from two independent sources: the First Amendment and the common law. *Stone v. University of Md. Med. Sys. Corp.,* 855 F.2d 178, 180 (4th Cir. 1988). The First Amendment right of access provides greater substantive protection to the public, but "has been extended only to particular judicial records and documents." *Id.* at 180-81 (citing *Rushford v. New Yorker Magazine, Inc.,* 846 F2d 249, 253 (4th Cir. 1988) (documents filed in connection with summary judgment motion in civil case); *In re Washington Post,* 807 F.2d 383, 390 (4th Cir. 1986) (documents filed in connection with plea hearings and sentencing hearings in criminal case)). When a First Amendment right is present, the court may restrict access "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone,* 855 F.2d at 180.

In contrast, the common law presumes a right of access to all judicial records and documents, *id.,* but the presumption may be rebutted "if countervailing interests heavily outweigh the public interests in access." *Rushford,* 846 F.2d at 253. The party seeking restriction of records bears the burden "of showing some significant interest that outweighs the presumption." *Id.* Factors that the court should consider in

---

[4] "'Judicial records' are generally defined as 'documents filed with the court [that] play a role in the adjudicative process, or adjudicate substantive rights.'" *Cochran v. Volvo Group North America, LLC,* 2013 WL 784502 (M.D.N.C. March 1, 2013) (quoting *In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(d),* 707 F.3d 283, 290 (4th Cir. 2013)).

weighing the competing interests "include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." *In re Knight Publ. Co.,* 743 F.2d 231, 235 (4th Cir 1984).

Nonetheless, materials attached to discovery motions arguably are not "judicial records" at all. *See Kinetic Concepts, Inc. v. Convatec, Inc.,* 2010 WL 1418312 at \*7 (M.D.N.C. April 2, 2010). In *Kinetic Concepts,* the Court quoted an unpublished Fourth Circuit opinion in which the Fourth Circuit "joined other courts in '[h]olding that the mere filing of a document with a court does not render the document judicial.'" *Id.* (quoting *In re Policy Mgt. Sys. Corp.,* 67 F.3d 296, 1995 WL 541623, at \*4 (4th Cir. Sept. 13, 1995)). Although the Fourth Circuit has not explicitly resolved the question of whether discovery motions and materials attached to discovery motions are judicial records, the Court has stated that the right of public access to judicial records attaches only when the records "play a role in the adjudicative process, or adjudicate substantive rights." *In re Application for an Order Pursuant to 18 U.S.C. Section 2703(D),* 707 F.3d 283, 290 (4th Cir. 2013). Thus, "[b]ecause discovery motions ... involve procedural rather than 'substantive' rights of the litigants, the reasoning of *In re Policy Management* supports the view that no public right of access applies [to discovery motions]." *Kinetic Concepts, Inc.,* 2010 WL 1418312, at \*9; *see also In re Providence Journal Com.,* 293 F.3d 1, 9 (1st Cir. 2002); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304, 1312 (11th Cir. 2001); *United States v. El-Sayegh,* 131 F.3d 158, 163 (D.C.Cir. 1997); *Leucadia,*

*Inc. v. Applied Extrusion Techs., Inc.,* 998 F.2d 157, 165 (3rd Cir. 1993). Consequently, in the absence of a public right to access materials, the court considering a motion to seal applies the "good cause" standard set forth in Fed. R. Civ. P. 26(c). *Pintos v. Pacific Creditors Ass'n.,* 565 F.3d 1106, 1115 (9th Cir. 2009).

When considering a motion to seal, the court "must comply with certain substantive and procedural requirements." *Va. Dept. of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004). First, the court must identify the substantive source of the right to access. Next, the court must (1) give the public notice of the motion and a reasonable opportunity to be heard; (2) "consider less drastic alternatives to sealing;" and (3) state specific findings and reasons for a decision to seal documents." *Id.*

Here, the benthic macroinvertebrate surveys were filed with the Court solely to facilitate a ruling on a discovery motion; accordingly, the surveys are not "judicial records" that trigger a First Amendment or common law right to access. Nonetheless to justify sealing the surveys, Defendants must provide good cause for restricting their availability to the public. Procedurally, the undersigned notes that the materials have been filed under seal, designated as sealed on the Court's docket, and have remained sealed for a period in excess of one month pending the Court's order; thus, the Court deems this sufficient notice and reasonable opportunity for the public to be heard. The undersigned further notes that Plaintiffs object to sealing the surveys, but no member of the general public has opposed Defendants' motion to seal.

In light of the Court's finding that Defendants could not establish good cause for prohibiting the use and disclosure of the benthic macroinvertebrate studies outside of this litigation, Defendant is hard-pressed to demonstrate good cause for

sealing them. Indeed, Defendants' primary argument for sealing the materials is that their disclosure would moot the pending motion for protective order. Therefore, the undersigned finds that Defendants have not provided good cause for sealing the benthic macroinvertebrate surveys and the motions to seal should be denied.

## V.    Order

Wherefore, for the forgoing reasons, the Court **ORDERS** as follows:

1. Defendants' Motion for Protective Order (ECF No. 33) is **DENIED**;

2. Defendants' Motions to Seal (ECF Nos. 31, 34) are **DENIED**;

3. The Clerk of Court is **ORDERED** to unseal ECF Nos. 31, 34, 35, 36, 37, 38, and all attachments thereto. **The Clerk shall delay implementation of the order to unseal until Monday, April 29, 2013 to allow Defendants an opportunity to appeal the order and request a stay from the Presiding District Judge;** and

4. The Clerk is further **ORDERED** to provide a copy of this order to counsel of record.

                                          **ENTERED:**  April 11, 2013.

                                          Cheryl A. Eifert
                                          United States Magistrate Judge