IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL COALITION,
WEST VIRGINIA HIGHLANDS CONSERVANCY and
SIERRA CLUB,

        Plaintiffs,

v.                              CIVIL ACTION NO. 3:12-0785

ELK RUN COAL COMPANY, INC. and
ALEX ENERGY, INC.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment on Jurisdictional Issues (ECF No. 57). Defendants filed no response. The Court **GRANTS** this Motion.

**I.    BACKGROUND**

Plaintiffs bring this action pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA") and the Surface Mining Control and Reclamation Act ("SMCRA"). Plaintiffs allege that Defendants Elk Run Coal Company, Inc., ("Elk Run") and Alex Energy, Inc., ("Alex Energy") violated these statutes by discharging excessive amounts of ionic pollution, measured as conductivity and sulfates, into the waters of West Virginia in violation of their National Pollutant Discharge Elimination System ("NPDES") permits and their West Virginia Surface Mining Permits. Before proceeding to the parties'

1

arguments, the Court will first discuss the relevant regulatory framework and the factual background of this case.

**A.     Regulatory Framework**

The primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of an NPDES permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b). West Virginia received such approval, and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). 47 Fed. Reg. 22363-01 (May 24, 1982). All West Virginia NPDES permits incorporate by reference W. Va. Code R. § 47-30-5.1.f, which states that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [W. Va. Code R. § 47-2]."

Coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program under the authority of 30 U.S.C. § 1253. West Virginia received conditional approval, and its surface mining permit program is administered through the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act

("WVSCMRA"). W. Va. Code §§ 22-3-1 to -33; 46 Fed. Reg. 5915-01 (Jan. 21, 1981). Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

West Virginia's water quality standards—as referenced in relation to both permits—are violated if wastes discharged from a surface mining operation "cause . . . or materially contribute to" 1) "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or 2) a "significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems." *Id.* § 47-2-3.2.e, -3.2.i.

B.   Factual Background

   1.   Elk Run

Elk Run operates the White Castle No. 1 Surface Mine and the East of Stollings Surface Mine, both in Boone County, West Virginia. Stip. ¶¶ 1, 12, ECF No. 47. Each mine is regulated both by NPDES permits and by West Virginia Surface Mining Permits issued by the WVDEP under the CWA and the SMCRA. *Id.* ¶¶ 3, 14. The White Castle No. 1 Surface Mine has seven valley fills that discharge from Outlets 001, 002, 003, 004, and 017 into Laurel Creek, a tributary of the Big Coal River. *Id.* ¶ 2. The East of Stollings Surface Mine also has seven valley fills that

discharge from Outfalls 001 through 007 and 019 into Mudlick Fork and Stolling Fork, tributaries of Laurel Creek. *Id.* ¶ 13.

According to the Declaration of Plaintiffs' expert, Margaret A. Palmer, Director of the National Socio-Environmental Synthesis Center at the University of Maryland, "a significant body of scientific research has clearly shown that levels of conductivity about ~ 300 uS/cm and elevated sulfate levels are common below Appalachian mine sites and lead to extirpation of invertebrate genera."[1] Palmer Decl., ECF No. 57-3. Pre-permit and pre-mining surveys in the Laurel Creek watershed showed conductivity in the range of 44.6 to 807 μS/cm, while more recent data show consistent conductivity levels above the 300 μS/cm level, with the majority of readings over 1,000 or 2,000 μS/cm. Stip. at 16-26 & ¶¶ 6, 8, 9, 17, 20.

2.     **Alex Energy**

Alex Energy operates the Robinson North Surface Mine and the Wildcat Surface Mine, both in Nicholas County, West Virginia. *Id.* ¶¶ 23, 45. Each mine is regulated both by NPDES permits and by West Virginia Surface Mining Permits issued by the WVDEP under the CWA and the SMCRA. *Id.* ¶¶ 27, 47. The Robinson North Surface Mine has four valley fills that discharge from Outlets 001, 002, and 003 into Robinson Fork. *Id.* ¶ 26. The Wildcat Surface Mine has a large valley fill which discharges from Outlet 004 into an unnamed tributary of Robinson Fork and from Outlet 007 into Wildcat Hollow, a tributary of Robinson Fork. *Id.* ¶ 46.

Recent data from surveys in the Robinson Fork watershed show consistent conductivity levels above the 300 μS/cm level, with the vast majority of readings ranging from 1,000 to 3,000 μS/cm. *Id.* at 29-32 & ¶¶ 35-38, 50-53. Before extensive mining took place in the Robinson Fork watershed, surveys showed sulfates in the range of 22 to 37 mg/l, while more recent data show

---

[1] Plaintiffs argue that this information, along with other evidence, shows Defendants have and are violating West Virginia's narrative water quality standards by causing harm to aquatic life or by having a significant adverse impact on the biological components of aquatic ecosystems.

consistent sulfate levels above 1,500 mg/l, with the majority of readings over 1,000 mg/l. *Id.* at 29-32 & ¶ 30.

## II.   ANALYSIS

### A.  Summary Judgment Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).

### B.  Standing

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston*

*Copper Recycling Corp* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000). In order to satisfy the minimum constitutional requirements for standing, a plaintiff must demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

When the plaintiff in question is an organization, it "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Among the injuries that may be addressed by a federal court are those to "an individual's aesthetic or recreational interests." *Gaston Copper I*, 204 F.3d at 154. This is of particular relevance to environmental cases. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972). In environmental cases, the "relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

In addition to meeting the constitutional standing requirements, a plaintiff must also satisfy any statutory requirements for standing. *Gaston Copper I*, 204 F.3d at 155. The citizen suit provisions of the CWA and the SMCRA confer standing on any person "having an interest which is or may be adversely affected." 30 U.S.C. § 1270(a); 33 U.S.C. § 1365(a), (g). The CWA permits such persons to commence a civil action against any person "who is alleged be in violation of . . . an effluent standard or limitation under [the CWA]." 33 U.S.C. § 1365(a)(1). Similarly, the SMCRA authorizes civil actions to be asserted against any person "alleged to be in

6

violation of any rule, regulation, order or permit issued pursuant to [the SMCRA]." 30 U.S.C. § 1270(a). These statutory grants of standing are coextensive with the constitutional standing requirements. *Gaston Copper I*, 204 F.3d at 152 (citing *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981)) (regarding CWA standing); *Ohio Valley Envtl. Coal., Inc. v. Hobet Min., LLC*, 723 F. Supp. 2d 886, 902 (S.D. W. Va. 2010) (regarding standing under the SMCRA). Accordingly, if a plaintiff meets the standing requirements of Article III, he also meets the standing requirements of the SMCRA.

In this case, Plaintiffs assert organizational standing through four specific members: Chuck Nelson, Maria Gunnoe, Cindy Rank, and James Tawney. The declarations of these individuals, which are uncontested, demonstrate that they have satisfied each of the following elements of standing.

    **1.**     **Injury in Fact**

The declaration of Chuck Nelson demonstrates a concrete and imminent harm to the declarant's aesthetic and recreational interests as a result of Elk Run's violations. Mr. Nelson, a member of Ohio Valley Environmental Coalition ("OVEC"), grew up along the Big Coal River and has been visiting Laurel Creek since the 1970s—where he would fish and wade in the water. Nelson Decl. ¶¶ 1, 2, 8, ECF No. 57-8. He also used to drive along the creek to Stollings Fork, where he would hunt and fish. *Id.* ¶ 9. Mr. Nelson continues to visit Laurel Creek, but he no longer wades or fishes in the water because of the pollution. *Id.* ¶¶ 10, 11. He would visit more often if he felt it was okay to wade or fish there. *Id.* ¶ 10. Mr. Nelson is extremely concerned about the harm to aquatic life in the creek caused by mining pollution and about the health of the people living along the creek. *Id.* ¶¶ 11, 12.

The declaration of Maria Gunnoe demonstrates a concrete and imminent harm to the declarant's aesthetic and recreational interests as a result of Elk Run's violations. Ms. Gunnoe, a member of all three plaintiff organizations, has visited the Laurel Creek area over thirty times during her lifetime. Gunnoe Decl. ¶¶ 2-4, 8, ECF No. 57-9. As a child, she used to catch and sell bait to fishermen and wade and play in the creek. *Id.* ¶ 9. Ms. Gunnoe continues to visit the creek, but she no longer attempts to catch bait or to fish because of the pollution. *Id.* ¶ 13. She "would not feel comfortable" eating any fish she caught in the creek. *Id.* Ms. Gunnoe finds the impact of mining pollution on aquatic life in the creek very upsetting. *Id.* ¶ 8. If the water was clean, she would share the area with her grandchildren and fish and catch bait there again. *Id.* ¶ 13. Ms. Gunnoe is angry that her children and grandchildren are "losing their mountain heritage and their ability to survive off the land," and she feels that the pollution in the creek is destroying her family's way of life and culture. *Id.* ¶ 14.

The declaration of Cindy Rank demonstrates a concrete and imminent harm to the declarant's aesthetic and recreational interests as a result of Alex Energy's violations. Ms. Rank, a member of all three plaintiff organizations, has been visiting Twentymile Creek[2] of the Gauley River for approximately twenty years, and during the past five years, she has visited at least twice per year. Rank Decl. ¶¶ 2, 5, 7, 9, 12, 16, ECF No. 57-10. She enjoys watching birds and other wildlife in the area and plans to continue to visit. *Id.* ¶¶ 16. 26. Ms. Rank expresses "concern and horror over the damage to the streams of Twentymile" Creek and states that she "see[s] red" when she thinks about the harm being done to the environment and the communities downstream by pollution. *Id.* ¶ 14. Ms. Rank also expresses concern about damage to aquatic life

---

[2] Robinson Creek is in the headwaters of Twentymile Creek. Rank Decl. ¶ 9. Robinson Fork is located at the confluence of Twentymile Creek and the creek into which Outlets 001 and 003 of the Robinson North Surface Mine empty. *See* Evan Hansen, *Monitoring Results: East of Stolling Surface Mine, Boone County and Robinson North Surface Mine, Clay County* 2, fig.2 (Downstream Strategies, June 17, 2013).

and "would be upset if the number and variety of birds and wildlife has been or will be reduced as a result of mining activities upstream." *Id.* ¶¶ 16, 20.

The declaration of James Tawney demonstrates a concrete and imminent harm to the declarant's aesthetic and recreational interests as a result of Alex Energy's violations. Mr. Tawney, a member of all three plaintiff organizations, has been visiting Twentymile Creek since he was a child, frequently swimming and fishing with his family there. Tawney Decl. ¶¶ 2, 4, 5, 9, 10, ECF No. 57-11. As a young man, he traveled up the public road along Twentymile Creek, hunted for game, looked for ginseng, and fished there. *Id.* ¶¶ 12, 14. Over the past five years, Mr. Tawney has visited Twentymile Creek at least two to three times per year to view aquatic life, watch other wildlife, and flip over rocks to check for insects, and he intends to return many times in the future. *Id.* ¶¶ 16, 18, 34. He stopped eating the fish he caught because he was afraid to eat them, and now he no longer fishes, wades, or swims at Twentymile Creek for the same reason. *Id.* ¶¶ 15, 21, 22. Mr. Tawney notes that "[m]ost of the fishing holes are gone, filled up by sediment from the mines," but he would resume fishing and wading there if the stream was cleaned up. *Id.* ¶¶ 21, 22. Mr. Tawney does not believe that the stream will ever be suitable for swimming again; he is "very upset and angry because of the degradation and destruction of Twentymile Creek and Robinson Fork caused by mining." *Id.* ¶¶ 22, 32.

The Court concludes that these four declarants have demonstrated a concrete and actual harm which each suffered to his or her aesthetic and recreational interests as a result of ionic pollution by Defendants in Stollings Fork, Laurel Creek, Robinson Fork, and/or Twentymile Creek.

### 2. Traceability

Plaintiffs' injuries are fairly traceable to Defendants' discharges of ionic pollution in alleged violation of their WV/NPDES permits. Defendants do not dispute that the areas used by Plaintiffs' declarants are areas that are affected by its mining and discharges.[3] It is undisputed that Defendants are discharging ionic pollution, measured as conductivity and sulfates, into these streams; Defendants' own sampling shows high levels of conductivity and sulfates. Stip. ¶¶ 9, 20, 22, 35-39, 50, 51, 53, 54. The Court finds that Plaintiffs' injuries are fairly traceable to Defendants' alleged violations because declarants claim the injuries resulted from elevated pollution in the same streams into which Defendants discharge pollutants. *Ohio Valley Envtl. Coal., Inc. v. Marfork Coal Co., Inc.*, No. CIV.A. 5:12-1464, 2013 WL 4509601, at *5 (S.D. W. Va. Aug. 23, 2013); *see also Crown Cent. Petroleum Corp.*, 95 F.3d at 362 (stating that plaintiffs may satisfy the "fairly traceable" element of standing in part by producing "water samples showing the presence of a pollutant of the type discharged by the defendant upstream").

### 3. Redressability

The Court finds that Plaintiffs also satisfy the final standing element, redressability. Plaintiffs seek injunctive relief requiring Defendants to reduce their discharge of ionic pollution to comply with the effluent limitations specified their permits. This relief would provide redress for Plaintiffs' injuries by reducing the amount of ionic pollution in Laurel Creek, Robinson Fork, Twentymile Creek, and the other waters at issue in this case.

### 4. Organizational Standing

The Court finds that Plaintiffs have constitutional and statutory standing. Declarants are members of some or all of the plaintiff organizations. They have demonstrated: (1) injuries in

---

[3] For example, Defendants do not argue that their discharges do not reach the streams used by the declarants, including Twentymile Creek.

fact, that are (2) fairly traceable to Defendants' alleged violations, and which (3) are able to be redressed by a favorable decision in this case. These four declarants support Plaintiffs' organizational standing because, A) as individual members, they would have standing to sue in their own right, B) the interests Plaintiffs seek to protect are germane to Plaintiffs' overall purpose to conserve and preserve the environment and natural resources,[4] and C) neither the claim asserted nor the relief requested requires the participation of individual members.

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment on Jurisdictional Issues[5] (ECF No. 57).

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: November 26, 2013

_____
ROBERT C. CHAMBERS, CHIEF JUDGE

---

[4] Gunnoe Decl. ¶¶ 2-4; Nelson Decl. ¶ 2; Rank Decl. ¶¶ 3, 6, 8; Tawney Decl. ¶¶ 3-5.

[5] Plaintiffs add a very brief section to the end of their Motion entitled "Plaintiffs have statutory standing to sue," in which they state that they have fulfilled the CWA's three requirements that 1) they provide adequate notice to the EPA, the state, and the alleged violator at least 60 days before filing suit; 2) neither the state nor the EPA has commenced a civil or criminal action against the alleged violator; and 3) the alleged violator be in "continuing violation" of the CWA. Pls.' Mem. Supp. Mot. Part. Summ. Judg. 9-10, ECF No. 58. However, these issues as understood by the Court are not "standing" issues, and more importantly, Plaintiffs fail to provide documentation of the notice given, admissible evidence that no suit has commenced, or any clear argument regarding whether they have alleged a continuing violation in good faith. Instead, Plaintiffs jump to the issue of liability—whether Defendants are in continuing violation of the CWA, not whether Plaintiffs' suit was brought in good faith. Liability is outside of the scope of this motion, and the CWA two-part notice issue is not adequately briefed for summary judgment. As such, the Court does not rule on any of these issues in this Order.